# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 14-22011-CIV-MARTINEZ/GOODMAN

JASON M. WANDNER,

      Plaintiff,

v.

AMERICAN AIRLINES, *et al.*,

      Defendants.

_____/

## ORDER ON PLAINTIFF'S REQUEST FOR SPOLIATION SANCTIONS

If the well-known, vinyl era rock bands Bad Company and Blind Faith had merged to form a super group, then the hypothetical new band might have been called Bad Faith, which would satisfy Plaintiff's burden to obtain the spoliation sanctions he seeks. Or the imagined musical group could have chosen to combine the precursor bands' names and called itself Blind Company. That could be a colorful, hyperbolic yet somewhat accurate description of how Plaintiff portrays Defendant Miami-Dade County's (the "County") handling of his written request to preserve video surveillance footage of his arrest -- the focal point of this case -- and the circumstances leading up to his detention.

Plaintiff's request that the County be taken on an involuntary trip to the land of sanctions for its mishandling of his request to preserve video evidence begins, like

many trips, at the airport, where Jason Wandner -- a criminal defense attorney -- went to meet his client.

Specifically, on January 15, 2014, Wandner went to the Miami International Airport (the "Airport") to meet his client at a gate on the concourse for a business trip to Jacksonville. Wandner parked his car and entered the terminal, but he never made his scheduled flight. What happened to Wandner at and around the American Airlines ticket counter and why he never made it to the gate is very much in dispute. What is not in dispute, however, is that Wandner was arrested for disorderly conduct and was transported to jail, where he bonded out approximately seven hours later. The State Attorney's Office *nolle prossed* the case the same day.

Five days later, on January 20, 2014, Wandner sent a letter to Miami-Dade County (the "County"), addressed to the airport, asking that all video surveillance of the  ticket counter and adjacent self-check-in areas be preserved for the two-hour window of 6:00 to 8:00 a.m. on January 15. The County received the January 20, 2014 letter and ultimately arranged for a maintenance employee to process Wandner's video preservation request. No one at the County took note of when the video would be destroyed through the standard protocol of recording over video after approximately 30 days. Essentially, despite Wandner's written request, the County allowed the video to be destroyed. Wandner claims that this failure has unduly prejudiced his ability to prosecute his later-filed civil lawsuit against the County (and other defendants) for,

among other things, malicious prosecution, negligence and a federal civil rights claims under 42 U.S.C. § 1983.

Wandner brands the County's mishandling of his written request as spoliation and asks for severe sanctions -- including a jury instruction for a mandatory adverse inference. The County, of course, opposes Wandner's request. It argues that its conduct falls far short of the bad faith necessary in this Circuit for the imposition of spoliation-related sanctions. And it contends that Wandner's request for spoliation sanctions suffers from other fatal flaws, including the failure to demonstrate that any actual evidence existed on the videos in the first place.

The Undersigned concludes, after a multi-hour evidentiary hearing [ECF No. 106] and supplemental briefing, that the County badly bungled Wandner's request to preserve the surveillance videos and is surely responsible for the videos' destruction. Nevertheless, the requested sanctions cannot be awarded because Wandner has not met his burden of proving that the County acted in bad faith. In addition, he has not sufficiently demonstrated that the videos contained any relevant evidence.

But Wandner will not be left without *any* potential tools to address this situation. Subject to a final ruling by United States District Judge Jose A. Martinez, who will preside at the trial and make the final evidentiary rulings, Wandner may introduce **evidence** of his written requests for video (there were two) and of the County's failure to preserve the videos, and he may also **argue** that the destruction of evidence

hampered his ability to present his case. He may also argue about the County's motivation to not preserve the tapes when it knew of likely litigation. To be sure, this is less powerful than a mandatory inference instruction, or even a permissible adverse inference instruction. But those two results are for *spoliation,* and the Undersigned finds that spoliation sanctions are not warranted here under current Eleventh Circuit law.

The factual background and legal analysis are outlined below.

## I.   Relevant Factual Background

### a.   Wandner's Version

According to Wandner's Amended Complaint [ECF No. 32],[1] he arrived at an airport parking garage approximately an hour before the scheduled 7:10 a.m. departure time for the American Airlines flight. Wandner contends that the parking ticket machine malfunctioned and did not issue him a ticket. Therefore, Wandner claims, he was forced to back up and enter through another parking garage lane and finally obtained an entrance ticket at 6:28 a.m.

Wandner parked, entered the terminal, and proceeded to the nearest American Airlines automatic check in kiosk machine to obtain a boarding pass. The machine would not print one, and Wandner claims he sought help from Derya Uysal, a ticket agent technically employed by Codefendant Swissport, USA who was acting as an

---

[1]     After the evidentiary hearing on Wandner's request for spoliation sanctions, the subject of this Order, he filed [ECF No. 111] a motion to amend his First Amended Complaint. All four Defendants filed a joint opposition to the motion [ECF No. 114]. They oppose the motion on both procedural and substantive grounds.

American Airlines agent. The Amended Complaint alleges that Uysal refused to give Wandner a boarding pass. Wandner says Uysal claimed the flight was "closed" even though it was at least 30 minutes until the scheduled departure time.

Wandner then phoned his client, who was at the gate. His client spoke to an American Airlines gate agent, who advised that the flight was *not* closed, had not even begun to board and that Wandner had sufficient time to reach the gate. Wandner then asked Uysal to contact a supervisor, and Uysal said she would call both a supervisor and the Miami-Dade police. The supervisor, another Swissport employee, arrived, refused to take any action and then walked away. At some point, Wandner called Uysal incompetent, and he claims that Uysal called police to retaliate for this comment.

Wandner contends that the **gate** agent, through a conversation with his client at the gate, advised that Wandner should ask for a ticketing change to a later flight, which would then permit him to stand by for the 7:10 a.m. flight. Wandner asked Uysal to issue him a ticket for the later flight. She took his driver's license, supposedly to facilitate his request, but then gave his license to Codefendant Lindsay Diaz, a County police officer who had by then arrived with three or four other officers. Uysal processed the ticket change and gave Wandner a boarding pass for the later flight.

At that point, Wandner says, he asked Officer Diaz to return his driver's license so that he could proceed to the gate, but Officer Diaz refused and told Wandner to stand off to the side. Wandner says he complied but told Officer Diaz that he had no

legal right to arrest or detain him and that his actions violated Wandner's constitutional rights. Wandner claims that Officer Diaz then immediately took him into custody, without conducting any investigation or observing any crime. He also claims that Diaz did not at the time advise him of the charges which supposedly justified the arrest.

Officer Diaz handcuffed Wandner and forced him to go on a "perp ride" on a golf cart to an office where he was handcuffed for two hours while police reports were drafted. Wandner says he made several requests to telephone his client, his office, his wife and the Jacksonville federal court (where he was to appear that day), but Officer Diaz and the other officers refused. Wandner claims that Officer Diaz and the other officers also refused his requests to remove the handcuffs and rejected his arguments that handcuffs were unnecessary because he is a member in good standing of the Florida Bar, had never been arrested before and was not a flight risk.

Wandner also contends that he asked Officer Diaz to issue a notice to appear, in lieu of an arrest and a jail booking, but Officer Diaz refused. Moreover, Wandner says, Officer Diaz advised him that he wanted Wandner to suffer the full consequences of being detained, including being booked into jail and being forced to bond out. Officer Diaz took him to the Turner-Gilford Knight Correctional Center, where he was booked and where he remained for seven hours before bonding out. After dropping off Wandner at the jail, Officer Diaz gave Wandner a copy of the arrest affidavit, which stated that disorderly conduct was the charge for the arrest.

Wandner had already bonded out by the time a judge began the afternoon's first appearances through the jail's video feed and the State Attorney's Office announced a *nolle prose* when his case was called.

In a letter dated January 20, 2014, Wandner asked the County to "**preserve any and all** video evidence taken at the Miami International Airport, at the American Airlines ticket counter and self-check-in on January 15, 2014 between 6:00 a.m. through 8:00 a.m., and at the gate where American Airlines flight number 3639 boarded between 6:00 a.m. through 8:00 a.m. This evidence is relevant for an **impending civil matter** relating to Jason M. Wandner's **false arrest** on that date under the above police case number." *See* Joint Composite Exhibit Binder submitted at Dec. 23, 2014 Evidentiary Hearing, p. MDC 36 (emphasis added). The letter also advised, "if you have any questions regarding the foregoing, please contact our office." *Id.* A county stamp in the lower right corner of the letter reflects a January 27, 2014 receipt date.

In a February 5, 2014 follow-up letter (stamped "received" on February 11, 2014), Wandner expanded his video preservation request to include any and all video evidence from the Airport parking garage entrance. *Id.* at p. MDC 83.

Wandner ultimately received video showing the parking garage but did not receive any for the ticket counter, self-check-in area or the gate where his client was waiting for him. He later learned that the County failed to preserve those videos.

As will be outlined shortly, the County's view of the facts is far different than Wandner's. It describes him as a rude, loud, angry and confrontational traveler who created a scene. Wandner denies this.

But, given the significant discrepancy between the competing versions of the facts leading up to the arrest, Wandner contends that video surveillance showing an **absence of activity** would have been critical to his case -- because it would support his version and undermine Defendants' rendition.

### b. The Defendants' Version

The County and Officer Diaz jointly filed a summary judgment motion with a separate statement of undisputed material facts. [ECF Nos. 96, 97].

According to these Defendants, Wandner did not know what time his flight was scheduled to board and arrived at the American Airlines self-service kiosk at 6:31 a.m. However, by this time, the flight was "final" -- meaning no additional persons could check-in because the flight was scheduled to depart in less than forty-five minutes. According to Officer Diaz and the County, the final counter check-in was 6:25 a.m., six minutes before Wandner first tried to check in at the kiosk.

They also explain that boarding passes are not issued after a flight is considered final and note that Wandner's 7:10 a.m. flight to Jacksonville began boarding at 6:42 a.m., boarded the last two stand-by passengers at 6:57 a.m. and then departed the gate seven minutes early, at 7:03 a.m.

Officer Diaz and the County say Wandner became frustrated when the machine advised him that a boarding pass could not be issued to him. He ran up to Uysal, who noticed that he appeared to be sweating, and he asked for her help. Uysal took him to the front of the line (even though other people were in line) but, after using the computer, determined that he could not get a boarding pass because the flight was closed.

Wandner did not accept that explanation, and he contacted his client by phone at the gate. After that conversation, Wandner renewed the matter with Uysal because he believed she gave him false information. Uysal refused his request to contact the gate. He thought this was unprofessional, and he told Uysal she was incompetent. He was angry and raised his voice at her.

Uysal asked him to calm down, advising that she would put him on the next flight. Officer Diaz and the County contend that he did not calm down, however. Wandner was warned several times that the police would be called if he did not stop yelling, stop cursing and stop slamming his hands on the counter. Wandner said he did not care if the police were called, which, according to Defendants, scared Uysal even more. Wandner emphatically slammed his hands on the counter, leaned toward Uysal, and told her, "I'm going to get on that fucking flight!" At that point, another ticket agent contacted police.

Defendants contend that an American Airlines mechanic working 100 feet away heard Wandner yelling and approached out of concern for Uysal's safety. Another ticket agent explained that Wandner's behavior disrupted all operations at the check-in counter.

Officer Diaz received a dispatch call to respond to a disturbance. When he arrived, Diaz saw Wandner facing Uysal, who appeared somewhat distraught. He also concluded that Wandner's hand gestures and mannerisms suggested that he was arguing with Uysal. Uysal advised Officer Diaz that Wandner was angry because the flight was closed, that she had put him on the next flight as standby but that he had become irate and started to scream at her.

Officer Diaz took Wandner's driver's license and tried to conduct a background search for outstanding warrants. According to Officer Diaz, Wandner got very close to his face and demanded his license be returned. Officer Diaz advised Wandner that he would return it when he was finished with it, and he asked Wandner to move back two feet. Wandner continued to make inflammatory accusations in an argumentative way. Another officer approached and tried to calm Wandner down, but those efforts failed. Wandner's interruptions prevented Officer Diaz from speaking further with Uysal and completing his investigation. The commotion caused all movement and business at the counters to stop, and Officer Diaz arrested Wandner at 6:50 a.m.

### c.   The Evidentiary Hearing About The Video Requests[2]

There are five witnesses who testified and who were involved in processing Wandner's requests to preserve security surveillance videos at the airport: Jordan Garber (a County clerk who requests videos from the video shop when a request is received), Victor Adriazola (a Miami airport video shop supervisor who delegates video copying to a technician), Janet Hutcheon (a claims adjuster for the County's risk management division who sometimes requests evidence in cases where there is an actual or potential claim against the County), Jesus Diaz (a County maintenance department employee who works for Adriazola in the video shop -- and who searched the videos requested by Wandner), and Milford Cockfield (a risk manager in the support services division of the County's Aviation Department).

Adriazola considered Wandner's initial written request to be insufficient, but he sent it on to Diaz for processing. The County notes, in its post-hearing memorandum [ECF No. 115], that Adriazola forwarded the letter to Diaz within minutes of receiving an email about it. Adriazola has worked with Garber to narrow the scope of other requests but has no recollection of doing so here.

---

[2]      In addition to the testimony adduced at the evidentiary hearing, the record has been supplemented with the deposition of Victor Adriazola, a County employee who is a supervisor at the Airport's video shop. [ECF No. 104]. The Parties agreed that the Adriazola deposition testimony could be used in lieu of live testimony because Adriazola could not appear at the evidentiary hearing. [*Id.* at p. 2].

Adriazola does not know how long it took to train Diaz for his video search and preservation job, but, either way, there was no training manual.

Garber's role is to summarize the request for videos and to send it on to the video shop, where a compact disc copy would be prepared if the requested video were located. His job includes a decision to ask for more information if the request is not specific enough. After reviewing Wandner's January 20, 2014 letter, Garber wrote an email to Hutcheon on January 27, 2014, the same day the letter was received, asking if it would be appropriate for someone to call and obtain more information. Garber made this request because he wanted to obtain a more-definite location of the requested video cameras. Garber was not sure if the County could have preserved all two hours' of videos from January 15, 2014 without a more-specific location. As it turned out, however, the County *could have* (but did not) copied all two hours' of videos. In fact, the County sometimes processes video requests that way -- by simply copying *everything* for a specific time window, from particular cameras.

In any event, Hutcheon responded by email the same day. In her email response, Hutcheon wrote: "The aviation departments [sic] obligation here is to preserve the video. I would assume that it involves some sort of disturbance. Please do that and provide us with the results. **I do not see the need for anyone at the airport to be calling the attorney.** The attorney is going to be **pursuing a claim** against the police

12

department for false arrest. We will go ahead and get a file set up on this end for the false arrest claim." *See* Joint Composite Exhibit Binder, p. MDC 3 (emphasis supplied).

Garber said he had no idea of the background surrounding the police-involved disturbance and said it would have been helpful if Hutcheon had contacted Wandner for additional information.

According to Garber, the video surveillance is preserved for approximately 30 days. The specific preservation time varies according to the camera and server involved. The County did not have a system to pinpoint when the 30-day (or similar duration) period expired. Garber was unaware of anyone at the County noting when 30 days (from January 15, the date of the incident) would expire.

Under questioning from an assistant county attorney, Garber explained that he does not know where the cameras are located or where they are focused, what information the video shop employees need in order to locate a particular video, or whether the video shop technicians think they have sufficient information to locate a requested video. Garber did not know Wandner or Officer Diaz and had no reason to help or hurt either of them. He never looked at video involved in the case and never tried to prevent the requested videos from being provided to Wandner.

Hutcheon received a copy of Wandner's January 20 written request but does not recall when she first saw it. She had heard that videos are preserved for between 20 to 30 days but she never calendared the expiration of the videos at issue in Wandner's

letter. Hutcheon did not know if there is a video camera for the American Airlines counter or the self-check-in at the kiosks. She now knows where the cameras are located and that the County has video cameras focused on the counter area. She never asked Garber what additional information he thought should be obtained from Wandner and she saw no need to contact him in response to his first letter. Hutcheon did, however, contact Wandner immediately (i.e., the same day) after receiving his second letter (for the parking garage video) but never received any additional information from him about his first letter. She never spoke to anyone at the video shop to see if the video existed.

On April 14, 2014 (almost three months after Wandner sent his initial request to preserve videos), Hutcheon received an email from Adriazola, advising that the request for video footage of the terminal was missing the boarding gate number. She tracked down the gate number for him.

Hutcheon did not know Wandner or Officer Diaz at the time she was involved with the County's response to Wandner's two video preservation letters and had no reason to cause the videos to be destroyed.

Diaz, the video shop employee tasked with the job of actually locating and preserving the videos, said he saw Wandner's January 20, 2014 letter request. Diaz explained that the video cameras were in fact working on January 15, 2014 and that it is possible to copy the entire video from the two-hour window requested. Diaz reviewed

multiple camera angles and felt confident that he had pinpointed the three specific cameras he thought would have captured what he believed to be the locations at issue.

Diaz sometimes simply **copies all videos** when a specific camera is mentioned. But instead of copying the videos from the three cameras which Diaz pinpointed as the ones he thought would best capture the American ticket counter and the kiosk areas, Diaz *watched* and *evaluated* the videos himself -- in order to find an "incident." Diaz said he searched for an incident, rather than just copying everything from the three two-hour segments, because the letter mentioned something about an "arrest."

Diaz said he was not provided with the specific camera numbers. He determined on his own the three cameras covering the areas (at the American Airlines check-in area, but not at the gate). He was looking for an incident between a civilian **and a police officer**. He never looked for an incident between a civilian and a **ticket agent**. He never alerted anyone about when the 30 days would expire and never asked anyone for more information before the 30 days passed. Diaz said that Wandner's letter gave him "an idea" of which cameras to search. The County notes [ECF No. 115, p. 4, n.2] that not all portions of the American Airlines ticket counter are covered by video surveillance.

On January 27, 2014, Adriazola received an email from Garber, attaching a copy of Wandner's January 20 written request. Sent at 10:58 a.m., Garber's email explained that the "request for preservation of video records" is one which "involves a Police involved incident" from January 15. *See* Joint Composite Exhibit Binder, p. MDC 7.

Adriazola then forwarded this email to Diaz. *See* Joint Composite Exhibit Binder, p. MDC 165.

Approximately three hours and forty-five minutes later, Diaz sent back a response email, explaining that "video footage by the Self Check In area for this incident was not found." *Id.* In his email, Diaz also asked for the specific gate for the flight. *Id.*

Diaz said he was able to thoroughly review all six hours of video (i.e., two hours each, for three cameras) in less than four hours because he watched one video at normal speed but viewed the other two videos at *four times* the normal speed. Diaz said he would have been able to discern an "incident" even when viewing the two videos at the accelerated speed.

Diaz said he later saw video of Wandner in the parking garage but never observed him on a video in the airport terminal.

Any videos he located would contain only video; audio is not captured.

As explained by Diaz, the videos are stored on hard drives, which are automatically rewritten when the hard drive is full. Diaz said the cameras capture images of the passengers, not only those of the ticket agents, at the counter area.

Adriazola does not know whether Diaz looked for the requested two hours of video or whether he searched for an incident. He does not know whether Diaz reviewed actual video footage and concluded that there was nothing there or whether

there was simply no footage of the requested areas for the two hours in question. Adriazola said it was not his job to evaluate the video preservation request to make sure that Diaz was handling it correctly. He trusted Diaz to do his job properly.

Meanwhile, Cockfield became involved in Wandner's written request to preserve video from the airport terminal in March to April 2014. He started working for the County on January 6, 2014. Cockfield became involved because he learned of a heated telephone conversation involving Wandner and a woman who worked as supervisor of the records center. Cockfield phoned Wandner in an attempt to help locate the video. At the time, he did not know that the videos recorded over themselves after approximately 30 days. Therefore, he thought the video might still exist in late March or April 2014.

Although Cockfield explained that there are now procedures for handling a written request to preserve a video, he did not know the procedures then and did not know at the time who was responsible for preserving and copying the requested video.

Cockfield did not know Officer Diaz or Wandner before telephoning Wandner.

## II.    Applicable Legal Principles

### a.  Jurisdictional Authority

Magistrate judges may issue an order on any "pretrial matter not dispositive of a party's claim or defense." Fed. R. Civ. P. 72(a). Such an order may not be set aside unless it "is clearly erroneous or is contrary to law." *Id.* Thus, magistrate judges have jurisdiction to enter sanctions orders for discovery failures which do not strike claims,

17

completely preclude defenses or generate litigation-ending consequences. Practice Before Federal Magistrates, § 16.06A (Mathew Bender 2010) ("discovery sanctions are generally viewed as non-dispositive matters committed to the discretion of the magistrate unless a party's entire claim is being dismissed").

In determining between dispositive and non-dispositive discovery sanctions, the critical factor is what sanction the magistrate judge *actually imposes*, rather than the one *requested* by the party seeking sanctions. *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519-20 (10th Cir. 1995) (rejecting argument that magistrate judge ruled on dispositive motion because litigant sought entry of a default judgment and explaining that "[e]ven though a movant requests a sanction that would be dispositive, if the magistrate judge does not impose a dispositive sanction," then the order is treated as not dispositive under Rule 72(a)); Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d § 3068.2, at 342-44 (West 1997).

Federal magistrate judges in this Circuit[3] frequently enter orders in cases where parties seek sanctions, including default judgments or dismissals, for spoliation. *See,*

---

[3]   Federal magistrate judges in other circuits routinely enter similar types of orders when the effect is not similar to a default judgment or does not preclude a defense. *See Moore v. Napolitano*, 723 F. Supp. 2d 167, 183-84 (D.D.C. 2010) (the district judge rejected the argument that the magistrate judge entered a "severe sanction akin to a litigation-ending default judgment" and affirmed the magistrate judge's order precluding the defendant from offering any legitimate, nondiscriminatory reason to rebut any prima facie case of disparate treatment discriminatory non-promotion of the individually named plaintiffs in an employment discrimination case); *Carmona v. Wright*, 233 F.R.D. 270, 276 (N.D.N.Y. 2006) (magistrate judges permitted to enter sanctions orders for

*e.g., Calixto v. Watson Bowman Acme Corp.*, No. 07-60077-CIV, 2009 WL 3823390 (S.D. Fla. Nov. 16, 2009) (Rosenbaum, J.); *Atlantic Sea Co., S.A., v. Anais Worldwide Shipping, Inc.*, No. 08-23079-CIV, 2010 WL 2346665 (S.D. Fla. June 9, 2010) (Brown, J.); *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317 (S.D. Fla. 2010) (O'Sullivan, J.). Indeed, federal magistrate judges in Florida have entered orders imposing adverse inferences and attorney's fees as sanctions in spoliation scenarios. *Optowave Co., Ltd. v. Nikitin*, No. 6:05-cv-1083-Orl-22DAB, 2006 WL 3231422 (M.D. Fla. Nov. 7, 2006) (Baker, J.) (imposing adverse inference jury instruction based on intentional failure to produce highly relevant emails); *Preferred Care Partners Holding Corp. v. Humana, Inc.*, No. 08-20424-CIV, 2009 WL 982460, at *8 (S.D. Fla. Apr. 9, 2009) (Simonton, J.) (awarding costs and fees for "grossly negligent discovery conduct" leading to the destruction of emails when bad judgment, but not bad faith, was responsible for the errors).

Because an adverse inference instruction does not strike a claim or defense and, in any event, this Order does not grant that relief to Wandner, this is a non-dispositive ruling that can be determined by a magistrate judge through an order under Rule 72(a).

---

discovery violations because they are "generally non-dispositive matters" unless the order imposes a sanction which "disposes of a claim; e.g., striking pleadings with prejudice or dismissal"); *Exxon Corp. v. Halcon Shipping Co. Ltd.*, 156 F.R.D. 589, 590 (D.N.J. 1994) (magistrate judge's order precluding expert witness from testifying as a sanction for violation of a pretrial discovery order was reviewed under the clearly erroneous or contrary to law standard of review). *Cf. San Shiah Enter. Co., Ltd. v. Pride Shipping Corp.*, 783 F. Supp. 1334 (S.D. Ala. 1992) (magistrate judge authorized to impose Rule 11 sanctions).

### b. Spoliation

In a diversity lawsuit such as this one, federal law governs the imposition of spoliation sanctions because they constitute an evidentiary matter. *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). Although federal law governs, the Court may look to state law for guidance to the extent that it is consistent with federal law. *Managed Care Solutions*, 736 F. Supp. 2d at 1322.

Spoliation refers to the destruction of evidence or the significant and meaningful alteration of a document or instrument. *Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003). But it is also defined as the "*intentional* destruction, mutilation, alteration or concealment of evidence, usually a document." *Calixto*, 2009 WL 3823390, at *13 (emphasis added) (internal citation omitted); *see also Se. Mech. Servs, Inc. v. Brody*, No. 8:08-CV-1151-T-30EAJ, 2009 WL 2242395, at *2 (M.D. Fla. July 24, 2009) ("the intentional destruction or concealment of evidence").

The courts in this Circuit have not always been consistent in providing a definition of "spoliation." Some definitions include the word "intentional," while others do not.[4] Because the Eleventh Circuit's decision in *Green Leaf Nursery* did not include

---

[4]     For example, the "intentional" component *is* included in the spoliation definitions in *Optowave Co., Ltd.*, 2006 WL 2321422, *Se. Mech. Servs.*, 2009 WL 2242395, and *Calixto*, 2009 WL 3823390. The "intentional" factor is not included in *Graff v. Baja Marine Corp.*, 310 F. App'x. 298 (11th Cir. 2009). *Graff*, however, is a "not for publication" opinion based, in part, on Georgia law. On the other hand, there is no "intentional" requirement found in the court's spoliation definition in *Corporate Fin.*,

"intentional" in its definition of the destruction of evidence requirement for spoliation, the Court will not include that requirement. 341 F.3d at 1308.

In meeting the requirement to demonstrate that the spoliated evidence was **crucial** to the movant's ability to prove its *prima facie* case or defense, it is not enough that the spoliated evidence would have been **relevant** to a claim or defense. *Managed Care Solutions*, 736 F. Supp. 2d at 1327-28 (finding that the allegedly spoliated evidence was not crucial to the plaintiff's claims because it could still prove its case through other evidence already obtained elsewhere); *see also Floeter v. City of Orlando,* 6:05-cv-400-Orl-22KRS, 2007 WL 486633, at *6 (M.D. Fla. Feb. 9, 2007) (missing emails may be relevant to Plaintiff's case but they were not critical and would have been cumulative).

Parties are permitted to ask trial courts to permit them to introduce into evidence at trial the *circumstances* surrounding their opposition's failure to retain and produce evidence, including emails, even when the trial court rejects the request for an adverse inference jury instruction. *Managed Care Solutions,* 736 F. Supp. 2d at 1334.

A court has broad discretion to impose sanctions for litigation misconduct based on its inherent power to manage its own affairs. A finding of bad faith, however, is required to impose sanctions based upon the court's inherent power. *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995).

---

*Inc. v. Principal Life Ins. Co.*, No. 05-20595-CIV, 2006 WL 3365606 (S.D. Fla. Nov. 20, 2006).

The district court has broad discretion to control discovery, including the ability to impose sanctions on uncooperative litigants. *Phipps v. Blakeney*, 8 F.3d 788, 790 (11th Cir. 1993).

In this Circuit, sanctions for spoliation of evidence may include "(1) dismissal of the case [or default judgment against defendant]; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation which raises a presumption against the spoliator." *Flury*, 427 F.3d at 945; s*ee also Walter v. Carnival Corp.*, No. 09-20962-CIV, 2010 WL 2927962 (S.D. Fla. July 23, 2010).

In the instant case, Wandner urges the third type of sanction -- imposition of an adverse inference. But there are different types of adverse inferences, ranging in differing and ever-increasing levels of harshness. One type results in a jury being instructed that certain facts are deemed admitted and must be accepted as true. Another type results in the imposition of a mandatory, albeit rebuttable, presumption. A third type permits a jury to presume that the lost evidence is relevant and favorable to the innocent party. With this third type of adverse inference, the jury also considers the spoliating party's rebuttal evidence and then decides whether to draw an adverse inference.

Stressing that recklessness was present and that this is the equivalent of bad faith, Wandner says his preference is for a mandatory inference instruction, but he also seeks a permissible adverse inference instruction if the Undersigned is not prepared to

grant his first request. He concedes that he would not be entitled to either type of inference instruction if he demonstrated only gross negligence or simple negligence.

As the party seeking spoliation sanctions, Wandner has the burden of proof. "[T]he party seeking [spoliation] sanctions must prove . . . **first,** that the missing evidence existed at one time; **second,** that the alleged spoliator had a duty to preserve the evidence; and **third**, that the evidence was crucial to the movant being able to prove its prima facie case or defense." *Walter*, 2010 WL 2927962, at *2 (citing *Floeter,* 2007 WL 486633, at *5) (emphasis added); *see also Managed Care Solutions*, 736 F. Supp. 2d at 1322.

### i. Bad Faith Requirement

But even if all three elements are met, "[a] party's failure to preserve evidence" rises to the level of sanctionable spoliation in this Circuit "only where the absence of that evidence is predicated on **bad faith**," such as where a party purposely "tamper[s] with the evidence." *Bashir v. Amtrak,* 119 F.3d 929, 931 (11th Cir. 1997) (emphasis added); *see also Penalty Kick Mgmt. Ltd. v. Coca Cola Co.* 318 F.3d 1284, 1294 (11th Cir. 2003) (no adverse inference from missing label because there was no indication of bad faith).

Although the Eleventh Circuit indicated in *Flury* that bad faith is only **a** factor to consider under Georgia spoliation law, 427 F.3d at 945, *Flury* does **not** stand for the proposition that bad faith is not required in this Circuit for an adverse inference jury

instruction based on spoliation of evidence under Florida law. Several reasons support this conclusion.

First, *Flury* construed Georgia spoliation law (not federal or Florida spoliation law).[5] Second, *Flury* was "a panel decision and as such did not overrule the prior panel decision in *Bashir*, requiring a showing of bad faith." *Managed Care Solutions*, 736 F. Supp. 2d at 1328, n.16 (noting that only the Supreme Court or an *en banc* decision from the Eleventh Circuit can judicially overrule a prior panel decision). Third, in several cases following the 2005 *Flury* decision, the Eleventh Circuit specifically and unequivocally held that bad faith **is** required for an adverse inference instruction as a sanction for spoliation. *See, e.g.*, *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009) (noting that a showing of malice is not required to find bad faith but emphasizing that an adverse inference can be "drawn from a party's failure to preserve evidence **only** when the absence of that evidence is predicated on bad faith") (emphasis added) (internal quotation omitted); *Cox v. Target Corp.*, 351 F. App'x 381, 383 (11th Cir. 2009) ("a jury instruction on spoliation of evidence is required only" when bad faith is responsible for the absence of the evidence); *BP Prods. N. Am., Inc. v. Se. Energy Grp., Inc.*, 282 Fed. App'x 776, 780 n.3 (11th Cir. 2008) (holding that an adverse inference presumption was appropriate where the district court implicitly determined that the defendant's actions were predicated on bad faith).

---

[5]     In *Brown v. Chertoff*, 563 F. Supp. 2d 1372, 1381 (S.D. Ga. 2008), the court stated that "since *Flury*, bad faith is only one factor to consider").

Phrased differently, mere negligence in losing or destroying records or evidence is insufficient to justify an adverse inference instruction for spoliation. *Bashir,* 119 F.3d at 931. The Eleventh Circuit's rule precluding an adverse inference in the face of simple negligence is that "it does not sustain an inference of consciousness of a weak case." *Id.* (internal quotation omitted); *see also Slattery v. Precision Response Corp.* 167 F. App'x 139, 141 (11th Cir. 2006).

Given this Circuit's requirement that an adverse inference flowing from spoliation requires the presence of bad faith, even **grossly negligent** discovery conduct does not justify that type of jury instruction. *Preferred Care Partners Holding Corp.*, 2009 WL 982460 at *7 (declining to order adverse inference even though party's performance in fulfilling discovery obligations was "clearly egregious" and even though the party's discovery failings "resulted from the grossly negligent oversights of counsel").

Because this Circuit, unlike some others, requires bad faith before permitting an adverse inference jury instruction when there is spoliation of evidence, courts deny the requested instruction when no bad faith is shown. *Slattery*, 167 F. App'x at 141 (employer's failure to produce documents did not justify an adverse inference because plaintiff had demonstrated "no evidence [of withholding] or tampering with any of the documents in bad faith"); *see also Penalty Kick Mgmt.,* 318 F.3d at 1293-94 (no evidence of bad faith in losing label at issue in lawsuit alleging improper disclosure of trade secrets).

In fact, district courts in our Circuit regularly deny adverse inference requests even when there is an indisputable destruction of evidence. *Socas v. Nw. Mut. Life Ins. Co.*, No. 07-20336, 2010 WL 3894142 (S.D. Fla. Sept. 30, 2010) (denying motion to dismiss and for adverse inference jury instruction when doctor negligently failed to suspend her ordinary policy of purging inactive patient files after learning the information in those files was relevant to her disability claim); *Managed Care Solutions*, 736 F. Supp. 2d at 1332; *Walter*, 2010 WL 2927962 (missing broken deck chair in lawsuit for injuries sustained when plaintiff's deck chair collapsed while he was a cruise ship passenger); *Atlantic Sea Co.*, 2010 WL 2346665 (failure to preserve spotlight and electrical wiring); *Calixto*, 2009 WL 3823390 (missing emails); *see also United States v. Barlow*, 576 F. Supp. 2d 1375, 1381 (S.D. Fla. 2008) (loss of PVC marker used to identify the location of a ship's grounding in a lawsuit brought by the government for damage to underwater sanctuary resources when defendant's boat ran aground).

When assessing the bad faith requirement for a sanctions award against an attorney under 28 U.S.C. § 1927, an admittedly different situation, the Eleventh Circuit emphasized that "bad faith" is the touchtone, that the statute is not about "mere negligence" but that objectively reckless conduct is sufficient to meet the bad faith requirement. *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239-42 (11th Cir. 2007) (noting that unreasonable and vexatious conduct under section 1927 occurs "only when the attorney's conduct is so egregious that it is tantamount to bad faith"); *see also*

*Young Apartments, Inc. v. Town of Jupiter, Fla.*, 503 Fed. App'x 711, 725 (11th Cir. 2013) (affirming fees award against plaintiff's attorneys under section 1927 and noting that "**bad faith** is an objective standard that is satisfied when an attorney knowingly or **recklessly** pursues a frivolous claim or engages in litigation tactics that needlessly obstruct the litigation on non-frivolous claims") (emphasis added) (internal quotation omitted); *Norelus v. Denny's Inc.*, 628 F.3d 1270 (11th Cir. 2010) (bad faith needed to prove that attorney multiplied court proceedings "unreasonably and vexatiously" for purposes of Section 1927 can be met by "objectively reckless conduct"); *Cf. Peer v. Lewis*, 606 F.3d 1306, 1315 (11th Cir. 2010) (explaining that the Court's inherent power is both broader and narrower than other means of imposing sanctions).

Assuming, for the sake of discussion only, that the Eleventh Circuit's standard for evaluating bad faith for a sanctions award against an attorney under 28 U.S.C. § 1927 is the same as the standard for spoliation sanctions under the Court's inherent power (and the Undersigned is not concluding that this assumption is correct when analyzing a spoliation scenario), then Wandner must, at a *minimum*, show that the County acted recklessly in order to obtain sanctions for spoliation under the Court's inherent power. If the standard is not identical, then Wandner must prove bad faith, which is more than gross negligence and reckless behavior.

The Undersigned is not required to wrestle with the issue of whether the reckless behavior which is tantamount to bad faith for a Section 1927 sanction against an

attorney may also be a method to prove the bad faith needed to invoke the Court's inherent powers for a spoliation sanction. As explained below, the Undersigned finds that Wandner did not meet his burden of establishing bad faith spoliation of the videos *even if* he could have demonstrated it through the less-stringent objectively reckless approach.

Parties can establish the requisite bad faith through either direct or circumstantial evidence. *Calixto*, 2009 WL 3823390, at *16. In order to demonstrate a party destroyed evidence in bad faith through circumstantial evidence, the movant must establish **all** of the following four factors: (1) evidence **once existed** that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an **affirmative act** causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator. *Calixto*, 2009 WL 3823390, at *16 (emphasis added); *see also Managed Care Solutions*, 736 F. Supp. 2d at 1331-32 (adopting four-factor test for circumstantial evidence of bad faith).

When a party's actions lead to the destruction of evidence but were not done in bad faith, then sanctions are inappropriate -- but this result "is not intended to preclude [the prejudiced party] from introducing into evidence the facts concerning the failure to

28

preserve relevant [evidence]." *Socas,* 2010 WL 3894142, at *9 (*citing Managed Care,* 2010 WL 3368654, at *13). Thus, an order denying spoliation sanctions would not be the death knell for Wandner's efforts to present the County's actions (or inactions) to a jury.

The Eleventh Circuit has not decided the appropriate evidentiary standard to use when the requested sanctions are based upon the Court's inherent powers. Nevertheless, the Undersigned finds persuasive a relatively recent decision by U.S. Magistrate Judge Andrea Simonton in *In re Brican Am. LLC Equip. Lease Litig.,* 977 F. Supp. 2d 1287, 1293, n.6 (S.D. Fla. 2013). In *Brican America,* the Court adopted two different evidentiary burdens, depending on the nature of the sanction imposed.

For "issue-related" sanctions -- "those that are fundamentally remedial rather than punitive and do not preclude a trial on the merits" -- the proof must be by a preponderance of the evidence. *Id.* (*citing Compton v. Alpha Kappa Alpha Sorority, Inc.,* 938 F. Supp. 2d 103, 104-05 (D.D.C. 2013)). In contrast, for "fundamentally penal" sanctions -- such as "dismissals and default judgments, as well as contempt orders, awards of attorneys' fees, and the imposition of fines" -- the clear and convincing standard is used. *Id.* (*citing* Compton, 938 F. Supp. 2d at 104-05). Judge Simonton used the preponderance of the evidence standard for the witness-tampering allegations insofar as the Plaintiffs sought non-dispositive sanctions and applied the more-exacting clear and convincing standard to the request for dispositive sanctions.

Wandner requests different types of sanctions, with a mandatory adverse inference jury instruction as the most severe and a jury instruction for a permissive adverse inference (after hearing the County's rebuttal evidence) as the least severe. Determining whether some, none or all of these three types of sanctions are fundamentally penal (as opposed to being remedial) is not one which the parties briefed. Nevertheless, the Court need not engage in the nuanced analysis required to classify the sanctions into one of two categories because the result would be the same under *either* standard of proof. *See also Qantum Comm'ns Corp. v. Star Broad., Inc.,* 473 F. Supp. 2d 1249, 1269-70 (S.D. Fla. 2007) (using clear and convincing standard when granting a sanctions motion and entering a default judgment and attorney's fees and costs).

### ii.   **The Parties' Contentions**

Wandner contends that the County's failure to preserve the videos of the ticket counter, kiosk check-in and concourse gate areas is bad faith.[6] He argues that the failure is attributable to more than simple negligence. Rather, Wandner argues that the County turned a blind eye to his request and points to Hutcheon's failure to follow up on Garber's suggestion to reach out to Wandner for more information as a prime illustration of bad faith. He notes that Hutcheon took the position that more

---

[6]        Wandner received a copy of the video surveillance from the parking garage.

information was not needed -- even though she did not know much about the specifics at the Airport.

Wandner's theory is that the County acted with callous disregard for the consequences of its actions (or inactions) or another person's rights. He focuses on the lack of written procedures for video preservation requests and the lack of meaningful supervisory oversight. He also emphasizes the County's complete failure to note or monitor when the 30 days expired and its failure to follow up with requests for more-specific information on a request that some of its employees deemed insufficient. In addition, he focuses on Diaz's decision to view only three of thirty-three video cameras covering the American Airlines area at the Airport.

Concerning the actual logistics of how the video review was done, Wandner challenges Diaz's decision to search for an incident, rather than simply copy the videos for the hours he pinpointed in his letter, and his related decision to watch two of the three videos at four times normal speed.

Because Diaz reviewed the videos for an incident involving a police officer, he would have *ignored* video of the exchanges or confrontations Wandner had with the ticket agents before Officer Diaz arrived. Wandner also argues that Diaz's choice to ignore his request and to instead look only for "incidents" necessarily means that substantive, helpful evidence has, in fact, been destroyed -- video footage showing **no** incidents with the ticket agents (because that would support his contention that he did

not slam his arms on the ticket counter or otherwise create a public disturbance). Specifically, Wandner argues that "even the **lack of heightened activity** observed by and brushed off as not worthy of preserving by Mr. Diaz would have been critical evidence in support of Plaintiff's claims." [ECF No. 113, p. 3 (emphasis in original)]. He also stresses that the other witnesses to these events are not independent because they all work for either the County or Swissport.

At the end of the evidentiary hearing, when the Undersigned gave counsel time for closing argument, Wandner's attorney conceded that he is not suggesting that the County knew the videos had harmful evidence and therefore *intentionally* destroyed them. In fact, he agreed that the videos could contain evidence which *helps* the County's defense in this lawsuit. Likewise, he was not suggesting that the County had an animus against Wandner or a bias in favor of Officer Diaz. Instead, his argument is that the County's response was so cavalier and so careless that it is tantamount to bad faith under the reckless behavior method of establishing it.

The County contends that its failure to preserve the requested videos of the counter area and kiosk check-in areas is an oversight caused by a misunderstanding or misinterpretation of the request. It contends that no County employee took affirmative steps to destroy the videos or to ensure that the automatic write-over procedure would cause the videos to be erased before they were preserved and copied. It says the County had no motive to help Officer Diaz or to hinder Wandner before he filed his lawsuit.

And it argues that the records contain many examples of its *good* faith, which, it suggests, is evidence that it did not act in bad faith.

In addition, the County argues that other, alternative evidence exists -- the testimony from other witnesses who witnessed Wandner's encounters with the ticket agents and Officer Diaz. And, to the extent that video of the gate would be relevant, Wandner has other witnesses available -- including his own client.[7]

The County argues that Wandner has come nowhere close to establishing the necessary bad faith he needs to obtain spoliation sanctions. And it says that negligence, even gross negligence (which it does not concede is present here), is insufficient.

The other two Defendants, American and Swissport, argue that sanctions would be unduly prejudicial to their positions because all Defendants have similar positions

---

[7]      Wandner contends that video of the **gate** would have been helpful because it could have confirmed that his client spoke to an airline boarding agent at the gate and then spoke to Wandner on the telephone. Under Wandner's theory, the video would help confirm that the flight had not boarded and that the agent told his client that the flight had not closed when he first challenged Uysal's comments and called her incompetent. But the Undersigned is not thoroughly convinced of the potential relevance. At most, the video would show Wandner's client speaking on the phone. Neither the identity of the other speaker or the contents of the conversation would appear on the video. Moreover, the video might also show his client speaking to the boarding gate agent. But, again, the subject of the conversation and the specifics of what was said would not appear on the video. Thus, the only way for a video (if one showing these conversations existed) to be substantively helpful is for Wandner's client and/or the gate agent to testify about what was being said. But that testimony could be introduced without the video. At best, the video might be of *modest* relevance, to the extent it showed the client on his cell phone.

on the facts -- and as a result, an adverse inference instruction which is detrimental to the County would necessarily and automatically also be detrimental to *them* at trial.

### iii.  **Analysis**

There is no doubt that the County mishandled Wandner's request to preserve the videos. The absence of written guidelines, the complete delegation of the process to a maintenance department employee who misinterpreted the request by searching for an "incident" (rather than merely copying the videos), the failure of anyone to even note (let alone monitor) when the 30-day period expired, the confusion over the sufficiency of Wandner's initial request, the expedited review (of six hours of video in less than four hours) of three videos (and the possibility that Diaz may have missed an encounter), Diaz's search for only encounters with police officers (which necessarily excluded all of Wandner's encounters with the ticket agents before police arrived), the relative ease of simply copying the videos (as requested) and allowing **Wandner** to search for relevant portions and the County's failure to follow up for more detailed information are hardly the hallmark of how to competently handle a request to preserve surveillance videos.

Given the numerous ways in which the County fumbled what should have been a straightforward request, the Undersigned has little difficulty concluding that the County's handling of the video preservation letter was *negligent.* In light of the myriad mistakes and miscalculations and the undeniable conclusion that the County's lapses

led to the destruction of many hours of videos, the Undersigned might even be prepared to classify the County's actions as grossly negligent.

But what the Undersigned cannot do is also conclude that the County acted in bad faith, *even if* that term included a recklessness standard (which, once again, the Court is not concluding is a standard for spoliation sanctions in this Circuit). The Undersigned's conclusion on this point is the same under both a preponderance of the evidence standard and a clear and convincing burden. Consequently, spoliation sanctions are unwarranted.

But spoliation sanctions (such as adverse inference jury instructions) would *still* be unavailable here even if I were to conclude that the County's conduct went beyond multiple goofs and reached the bad faith level. That is because Wandner has not met *other* prerequisites:

First, Wandner has not proven that the missing evidence actually existed at one time. Although the video surveillance footage existed at one time before being written over, Wandner has not established that any of the footage is of **him.** Assuming that Diaz thoroughly and carefully reviewed every second of the six hours of video and engaged in a meticulous, error-free review, all he could say was that he did not see any encounters involving a police officer. Therefore, the conclusion would be that the video of Wandner's actual arrest (or false arrest, assuming his allegations are correct) did not exist before the video was overwritten. But if Diaz did a poor job of viewing six hours of

videos and allowed his concentration to lapse, then Wandner would still not have proof that any portion of the videos were of him. All he would have is a *possibility* that the videos captured him digitally on film.

Moreover, Wandner's argument that a video showing *no activity* would be helpful needs to be analyzed more carefully than simply accepting the notion that any type of non-activity would assist Wandner. The only non-activity which would help Wandner is video of **Wandner** doing nothing -- e.g., not slamming his hands down on the counter, not wildly gesticulating in front of the ticket agent, etc. If that type of video evidence had existed, then it would have bolstered Wandner's version that he did not engage in conduct constituting disorderly conduct.

But mere video of *others* (e.g., other passengers, ticket agents, security officers, visitors, luggage handlers, police officers, pilots and flight attendants, etc.) would be of no help to Wandner (or the County, for that matter) unless Wandner himself were shown doing nothing. Otherwise, an acceptable conclusion would be that the cameras captured *some* passengers at the counter or at the kiosk area but did not for some reason happen to film **Wandner.** Therefore, Diaz's statement that he saw no incidents involving a police officer during the six hours of videos he watched does not mean that the destroyed, rewritten videos would have helped Wandner. It might merely mean that Wandner was not captured on the videos at all. Thus, all Wandner can say persuasively is that the videos *might* have helped him *if* they had shown him at the

counter and *if* they established that he did not slam the counter or otherwise create a disturbance. Yes, the videos might have shown him at the counter in a non-aggressive way, but they might have also not shown him at all.

This is not a situation where cameras malfunctioned, where there was a computer glitch, where there was a power outage or where the videos were blank for those reasons or other reasons. To be sure, the videos contained *something*. Diaz was not watching six hours of nothing. But the something he watched (and which was later deleted) may have the evidentiary value of nothing if the videos did not film Wandner. Wandner has not established that they did. He has not pinpointed exactly where in the airport he was arrested. He has not established that any video camera (including the three Diaz watched) would necessarily have filmed him being arrested or speaking with the ticket agents.

Even if one or more cameras would have filmed the area, the cameras may not have captured him at the relevant times. Other passengers or employees could have been standing next to, in front of or behind him, blocking the views. Luggage, luggage carts, boxes, animals or other things could have obstructed the cameras' view at the critical moments. So the "something" captured in the video could be nothing or it could be anything or it could be everything. Who knows?

To sum up this point, Wandner has not met his burden of demonstrating that the video evidence he sought actually existed before the videos were not preserved because

37

they were overwritten. *Cox*, 351 Fed. App'x 381 (affirming denial of requested jury instruction on spoliation of evidence where customer was unable to establish that the video footage of her fall existed at all because the video cameras did not provide comprehensive coverage of the entire store).

Second, the County does not challenge the second element (that it had a duty to preserve evidence once it received Wandner's written request), but it challenges Wandner's ability to meet the third requirement: that the evidence was *crucial* to his ability to prove his *prima facie* case. There are several witnesses to Wandner's exchanges with the ticket agents and Officer Diaz. The mere fact that they happen to be employees of American Airlines, the airline's agent (Swissport) or the County does not mean that alternative evidence is not available. Wandner may not like their testimony, but this does not equate to a situation where a party destroyed the **only** evidence concerning a critical issue.

Third, the evidence may not have assisted him in proving his case. The evidence may have *hindered* his ability to prove his case. For example, if the videos had depicted him acting in a confrontational, belligerent, bellicose manner, then the evidence would have helped the *County* and the other Defendants (and hindered his ability to prove his case). Indeed, this possible scenario -- that the destroyed video would have hampered Wandner but helped the County -- is part of the reason why the Undersigned concludes

that the County did not act in bad faith. It had no motive to purposefully destroy the videos or act in bad faith because the videos might have helped its defense.

Fourth, the Undersigned cannot rule out the notion that the affirmative act causing the loss of the videos cannot be credibly explained as not involving bad faith by the reasons proffered by the County, the spoliator. In fact, the County points to conduct which it construes as good faith.

For example, the County notes that some of its employees tried to affirmatively help Wandner track down the videos once they became aware of his efforts and his frustration. Even Hutcheon, the claims adjuster who initially rejected the suggestion that Wandner be contacted and asked for clarifying information on his first written request, reached out and telephoned Wandner for his second request. Likewise, Cockfield telephoned Wandner when he realized that Wandner was unhappy with the lack of results. To be sure, Cockfield's actions occurred months after Wandner made his request (which means that the videos had already been effectively erased), but he was a new County employee and was not aware of the specifics of how the video shop processed requests. Moreover, in denying Garber's request to obtain clarifying information, Hutcheon reaffirmed the obligation to preserve the videos.

## III.    Conclusion

The Undersigned **denies** Wandner's request for spoliation sanctions but will not preclude him from presenting the facts (and related, permissible arguments)

surrounding his preservation requests and the County's failure to achieve that result to the jury, subject to Judge Martinez's oversight as the district judge who will preside over the trial.

**DONE AND ORDERED** in Chambers, in Miami, Florida, January 12, 2015.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

<u>**Copies furnished to**</u>:
Honorable Jose E. Martinez
All Counsel of Record